# MANASOTA-88, INC. and CONCERNED CITIZENS OF CITRUS COUNTY, INC. v DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES

## Case No. 85-2813R

State of Florida, Division of Administrative Hearings

December 20, 1985

### APPEARANCES OF COUNSEL

**Thomas W. Reese** for petitioners.

**Richard A. Patterson** and **Steven W. Huss,** Department of Health and Rehabilitative Services, for respondent.

**Mark F. Carpanini** for intervenor Polk County.

### OPINION

WILLIAM C. SHERRILL, JR., Hearing Officer.

## FINAL ORDER

The final hearing in this case was held in Tallahassee, Florida on September 19, 1985.

At issue in this case is the validity of proposed rules 10D-91.1101-1109. Petitioners assert that the rules are constitutionally inadequate and are an invalid exercise of delegated legislative authority.

Petitioners presented the testimony of Gloria C. Raines, Miriam Cohen, and Lyle Jerrett, as well as deposition testimony listed in the exhibits. Respondent presented the testimony of Mason C. Cox. Petitioners presented 26 exhibits listed on the exhibit list, and Respondent presented 8 exhibits. Polk County, Intervenor, presented no evidence.

## FINDINGS OF FACT

1. Petitioners, Manasota-88, Inc. and Concerned Citizens of Citrus County, Inc., filed their petition on August 9, 1985, challenging proposed rules 10D-91.1101 through 91.1109. These proposed rules were published in Vol. 11, No. 30., Florida Administrative Weekly, on July 26, 1985. Petitioner's Exhibit 1.

2. The proposed rules cite sections 404.051(4) and 404.056, Florida Statutes, as authority for rulemaking. These sections provide:

404.051 Powers and duties of the Department of Health and Rehabilitative Services.—*For protection of the public health and safety*, the department is authorized to:

\* \* \*

(4) *Adopt, promulgate*, amend, and repeal *rules* and standards which may provide for licensure, registration, or regulation *relating to the manufacture, production, transportation, use, possession, handling, treatment, storage, disposal, sale, lease, or other disposition* of radioactive material, *including naturally occurring radioactive material and low-level radioactive waste*, and radiation machines as may be necessary to carry out the provisions of this chapter. The *recommendations* of nationally recognized bodies in the field of radiation protection *shall be taken into consideration* in the adoption, promulgation, amendments, and repeal of such rules and standards.

404.056 Land radiation emission standards. *To preserve and protect the public health*, the department is authorized to establish, by rule, and enforce *any* environmental standards for land which, either in its natural state or subsequent to mineral extraction, emits radiation. In the establishment of such rules, the department shall *consider*:

274

(1) *Existing federal standards.*

(2) The *recommendation* of nationally recognized bodies which are expert in the field of radiation protection.

(3) The effect on private or public water supplies.

(4) The *use made, or to be made, of the land.*

(5) The proposed rule of the land for residential dwellings, public or private schools, or commercial buildings.

(6) The *availability of measures to mitigate the effect of the radiation.* (E.S.)

3. Petitioner, Manasota-88, Inc., is an environmental health organization. T.23. It was established in 1968. Id. Though the petition alleges that this Petitioner is a non-profit corporation, there appears to be no record evidence of this point. Apparently this Petitioner has "members," see T. 23-24, but the record does not contain evidence of the relationship of those members to the alleged corporation.

4. Some members of Manasota-88 own reclaimed phosphate land in Polk County, and Ms. Raines knew of about five such persons. T. 23.

5. About 150 members of Manasota-88 live on mineralized land in Sarasota County. Members of Manasota-88 work and shop in areas where commercial structures could possibly be built on reclaimed phosphate or mineralized land. T.24.

6. There was no proof of the number of "members" of Manasota-88, Inc.

7. Ms. Raines is chairperson of Manasota-88, Inc., and was a member of the Governor's phosphate-related radiation task force. T.24.

8. Manasota-88, Inc. participated in all of the rule-making hearings with respect to the proposed rules in question in this case. T.26.

9. Petitioner, Concerned Citizens of Citrus County, Inc., is an environmental organization formed to protect the natural resources of Citrus County through proper planning. T.28. Miriam Cohen is secretary and a member of the board of directors. T.27. The organization has 1500 members, living in all sections of Citrus County. T.28. Some members own reclaimed phosphate land in Citrus County. Some live on reclaimed phosphate lands. Id. There is no direct evidence of the numbers of such persons, or direct proof of the alleged corporate structure of this Petitioner or its relationship to its members.

10. Proposed rule 10D-91.1104 provides a goal that radiation exposure to the public from naturally occurring radiation be mained "as

close to normal background radiation levels as reasonably achievable," which is 0.009 working levels (WL) for the annual average radon decay product concentration. T.34. The upper limit mandated by the rule as a ceiling, and not a goal, is 0.02 WL. Id. See Petitioner's exhibit 1, proposed rule 10D-91.1104.

11. The proposed rule, in section 10D-91.1108, requires county health departments having certain defined lands within the county to conduct educational programs to advise the public that dwellings located on such lands have the potential of exceeding the standard set forth above. Such programs must include recommendations for periodic measurement and methods to effect remedial actions. T.116. The lands are defined by proposed rule 10D-91.1106(1) to include lands which have previously been mined or reshaped as the result of the extraction of phosphate ore and mineralized lands known to contain uranium, thorium, or their decay products in such amounts that radiation could be in excess of the above standards.

12. The proposed rule, in section 10D-91.1106(1)(b) provides that the Department of Natural Resources shall provide HRS with a description of such lands, and that HRS will disseminate such information to building inspection offices affected.

13. The proposed rule has a notification procedure whereby certain test results are provided to owners of newly constructed dwellings when the above standard is exceeded. See proposed rule 10D-91.1106(2)(b) and (d).

14. Other than the foregoing, the proposed rule does not require any other notice to persons. In particular, the proposed rule does not require that sellers or lessors give notice to prospective buyers or lessees.

15. The proposed rule provides that newly constructed dwellings which do not use a construction technique described in section 10D-91.1106(2)(a) or (b), and which exceeds the standards set forth above, must be remedied by the owner to comply with the standards. No other mandatory remediation is required. Remediation in these other cases is discretionary with the owners, although, as set forth above, county health offices must publicize remediation methods.

16. New dwelling construction that uses "ventilated crawl spaces" as defined by the rule are exempt from testing. New dwelling construction on reclaimed phosphate land that uses "improved monolithic slab" or "post-tensioned slab" techniques as defined by the rule will be tested by HRS during the first year of occupancy using a track etch device or a thermoluminescent device. If the test results show that the standard is

276

exceeded, the owners will be advised of the result and advised of discretionary remedial action that they can take. No testing is required of existing dwellings. Pre-occupancy testing is required only of newly constructed dwellings which do not use one of the three construction techniques set forth above.

17. The International Commission on Radiological Protection (ICRP) is a group of internationally known scientists. T.105. The IRCP, in a 1983 report on radiation protection, recommended a standard of as low as reasonably achievable not to exceed 0.027 WL, which is higher than that in the proposed rule. T.105; HRS exhibit 4, p. 7.

18. The National Council on Radiation Protection and Measurement (NCRP) recommends a standard of as low as reasonably achievable not to exceed 0.004 WL. T.106-107; HRS exhibit 5, pp. 88-89; Petitioner's exhibit 25H, p. 13.

19. The Governor's Phosphate Radiation Task Force of 1982 recommended 0.027 WL. Petitioner's exhibit 25F, p. 15.

20. Other states have either considered or adopted the same standard as adopted in this proposed rule: as low as reasonably achievable not to exceed 0.02 WL. T.98.

21. In February, 1979, in a letter from the Environmental Protection Agency (EPA) to the Governor of Florida, the EPA recommended several standards for radiation levels on Florida phosphate lands. These recommendations were summarized on pp. 38665 and 38666 of Petitioner's exhibit 5. The first recommendation is that remedial action *"should be taken"* in all residences in which "the initial indoor air concentration of radon decay products exceeds 0.02 Working Level (WL), including normal indoor background." The second recommendation provides:

II. When annual average air concentrations of radon decay products are less than 0.02 WL, remedial action required to reduce such concentrations to *as low as reasonably achievable levels should* be taken. Among the *factors to be considered* in determining the appropriate degree of reduction are the *cost* and *effectiveness* of available remedial measures, the *health risk* averted, the normal background level, the life expectancy of the structure, and *measurement uncertainties*. (E.S.)

The third recommendation is that remedial action is not warranted in existing residences solely to reduce the indoor gamma radiation exposure rate. The fourth and final recommendation is that development

sites for new residences be selected and prepared and the residences designed and sited so that the annual average indoor air concentration of radon decay products and gamma radiation does not exceed average normal background levels (indoor) plus uncertainties of normal background variation and measurement capability.

22. The average normal indoor background level of radiation is about 0.004 WL for annual indoor air concentration of radon decay products, and 6 microroentgens per hour for gamma and x-rays. Petitioner's exhibit 5, p. 38666. Uncertainties due to normal variations and measurement capability add 0.005 WL and 6 microroentgens, thus making the EPA "as low as reasonably achievable" standards to be 0.009 WL and 11 microroentgens per hour. Id.; T.34.

23. The supporting text of Petitioner's exhibit 5 makes it clear that the EPA did not recommend mandatory remediation below 0.02 WL. The technical information section states an attempt to achieve the "as low as reasonably achievable" standard would impose unreasonable costs in 25% of the cases. The technical information section further shows that costs and practicality are factors to be considered in trying to achieve lower levels:

In order to provide flexibility to bring about remediation *when costs are reasonable,* remediation is recommended whenever responsible authorities determine that it is *practicable* to do so in the range between 0.02 WL (including normal indoor background) and 0.005 WL above normal background. (E.S.)

Petitioner's exhibit 5, p. 38668. The technical information section describes the recommended standard for radon daughter product level below 0.02 WL as being "discretionary" with respect to remediation:

The recommendations provide that when the radon daughter product level in existing homes is less than 0.02 WL (including normal background indoors) action be taken to reduce the radon concentration to as low as reasonably achievable levels. It is recognized that a *discretionary* policy such as this may complicate implementation of the recommendations since decisions must be made regarding which exposure level can be considered as low as reasonably achievable for each structure. To assist in making such decisions several factors should be considered:

\* \* \*

3. The *cost* to reduce the level should be evaluated. . . .

\* \* \*

5. The social and *economic inconvenience* to the inhabitants

278

should be considered. Some inhabitants may find expenditures to install control technology prohibitive and a major disruption to their life styles. (E.S.)

Petitioner's exhibit 5, p. 38669.

24. On September 20, 1984, Richard J. Guimond, Director, Criteria and Standards Division, Office of Radiation Programs for the EPA, characterized the 0.02 WL as "a remedial action level," specifically referring to the letter which is Petitioner's exhibit 5, and characterized the reduction of radiation levels to a point not "significantly above normal background levels for Florida" as the goal of construction methods for new housing. In the next paragraph he stated: "We do not believe it is appropriate to establish a remedial action level for new housing different from that for existing housing." Attached to his letter wee what Mr. Guimond referred to as "our comments" on the draft of the Governor's phosphate Related Task Force standards. In the last sentence on the first page of those comments, the EPA comments state:

The *difficulties in enforcement may discourage* the incorporation of the *ALARA* [as low as reasonably achievable] principle *in regulations*, but the practice *should,* at a minimum, *be encouraged* in the text that accompanies the standards. (E.S.)

25. In summary none of the EPA recommendations above explicitly recommend mandatory remediation. Even where more than 0.02 WL is present, the EPA recommendation only says that remediation "should" be taken. See Recommendation I above. Below 0.02 WL, EPA Recommendation II expressly lists factors to be considered in determining whether or not remediation should be taken. Moreover, the EPA did not specifically consider in any great detail what might be needed to achieve Working Levels below 0.02, and saw this as within the discretion of the state. Petitioner's exhibit 25A, p. 12. See findings of fact 21 through 24.

26. By letter dated March 22, 1985, Sheldon Meyers, Acting Director, Office of Radiation Programs for the EPA, wrote to the Respondent to comment on the proposed rules for radiation levels in newly constructed houses. Mr. Meyers stated that "we . . . concur in the numerical standards you have proposed." Petitioner's exhibit 8. Mr. Meyers further praised the Respondent for using design criteria rather than direct radiation standards. *Id.* Mr. Meyers was critical, however, of the automatic exemption of testing of new houses using monolithic slabs or ventilated crawl spaces. Mr. Meyers stated that they were not aware of any data demonstrating that monolothic slabs have long-term effectiveness in preventing radon entry, that cracks are likely to appear

over the normal lifetime of a house, and that there was not enough data to justify using a monolithic slab alone to prevent radon entry. He recommended that the monolithic slab be used only in conjunction "with other radon resistant techniques, such as well-sealed polymer barriers and sub-slab ventilation systems." He also questioned the use of crawl spaces, saying his date was "incomplete." He concluded by recommending that a testing program be used to certify construction techniques, and that while crawl space certification may be easy, that monolithic slab performance may take longer. Mr. Meyers did not expressly state that "all structures be subjected to preoccupancy and long term monitoring," as proposed by Petitioners in proposed finding of fact 32.

27. The rule requires both types of slab construction to have a polyethylene (or equivalent) soil gas barrier. Petitioner's exhibit 1; Petitioner exhibit 25G, pp. 37-38.

28. Use of ventilated crawl spaces, monolithic slabs, or post-tensioned slabs, is expected to reduce radiation levels to the "as low as reasonably achievable" levels set forth in the rule, based upon current understanding of these building techniques. Petitioner's exhibit 25F, p. 33-34; T. 36-40. It is reasonable, however, for there to be some continued data collection to see how these building techniques perform in future years. Petitioners exhibit 25A, pp. 13-19, 57; T.40.

29. It would not be reasonable to set the mandatory upper limit at the background level of 0.09 WL because as the background level is approached, one cannot tell whether the level of radiation is due to normally expected background or is due to the phosphate caused excess. Petitioner's exhibit 25H, pp. 22, 15; Petitioner's exhibit 25F, pp. 35-36. Setting the mandatory upper limit that close to the normal background level would make the rule unmanageable and difficult to enforce. *Id.* The problem is not that monitoring devices are inaccurate, but that the readings from such devices, at the background level, increasingly run the risk of overregulation. *Id.*

30. The "track etch" radon decay products detection device is a simply detection device, without moving parts, that has been almost universally accepted over the past ten years as a measuring device in uranium mines, and is a widely accepted measuring device. T.109. A second detection device, using a thermoluminescent detector, is the "RPISU," or the radon progency [sic] integrating sampling units. The RPISU is widely accepted and used. T.110. Both devices are recommended by the EPA and by most of the measuring standards organizations, including the Bureau of Standards. T.111; Petitioner's exhibit 25H, pp. 37-38.

280

31. The Respondent anticipates that it will use the track etch detection device to monitor radon daughter levels when new construction involves either an improved monolithic slab or a post-tensioned slab. T.113. The Respondent contemplates using the RPISU for monitoring radon levels for new constructed dwellings tested pursuant to proposed rule 10D-91.1106(2)9(d). *Id.*

32. Various agents and employees, as well as other persons, expressed varying opinions as to the legal question of whether the Respondent has legal authority to require more rigorous forms of public notification, and the Respondent appears to have considered these various opinions. See HRS exhibit 7; Petitioner's exhibit 10, 17, 25E (p. 4), and 15.

33. Evaluation of problems of enforcement, cost of enforcement, and economic inconvenience to persons regulated are consistent with EPA guidelines. See findings of fact 23 and 24 above.

34. *Lifetime* residency (75%) occupancy of a residence with an air concentration of 0.02 WL is predicted to result in a 70% increase in lung cancer, from 2 per 100 to 5 per 100. Petitioner's exhibit 5, p. 38668. If 80% reduction of all cases above 0.02 WL is achieved, 60% of the excess risk of lung cancer will be eliminated; if 80% reduction of all cases above 0.005 WL (plus 0.004 WL background) is achieved, 75% of the excess risk of lung cancer will be eliminated. *Ibid.* Thus, the benefit of going all the way to the as low as reasonably achievable level is to eliminate another 15% of the excess risk of lung cancer, or 0.45 cases per 100 persons.

35. The proposed rule does not place any mandatory duties upon local building inspection offices. The proposed rule states:

> *10D-91.1107 Inspection and Notification of Test Results.* (1) Following an evaluation of the test data for dwellings specified in 10D-91.1106(2)(d), the Department shall send the appropriate building inspection office a letter *recommending* approval or denial of occupancy no later than 5 working days after evaluating the test data.
>
> * * *
>
> (2) Each building inspection office . . . *should* given written notice of the prospective building or owner of the dwelling of the requirements of this part and *should* assure that occupancy of the dwelling is not permitted until confirmation is received from the Department that the dwelling has met the standards contained in 10D-91.1104(2), or until inspection has verified that the dwelling is constructed in accordance with 10D-91.1106(2)(a) or (2)(b).

281

Thus, the County building inspector will receive the recommendations of the Respondent, but has no mandated duties. The proposed rule only suggests what the county building inspector "should" do. The testimony was not in conflict with the proposed rule. The witness who testified on this point stated that "we really would expect" the building office to refuse to issue a certificate of occupancy. He did not testify that the local building inspector was required to withhold the certificate of occupancy. T.64-65.

36. The Hearing Officer officially recognizes that intervenor, Polk County, is a political subdivision of this state.

37. Findings of fact adopted by reference in the Appendix, as well as explicit findings of fact made in the Appendix, are incorporated herein by reference.

## CONCLUSIONS OF LAW

1. An association has standing to act as a representative of its members in a challenge to a proposed rule or to an existing rule if it can demonstrate ". . . that a substantial number of its members, although not necessarily a majority, are 'substantially affected' by the challenged rule." *Florida Home Builders Association v. Department of Labor and Employment Security*, 412 So.2d 351, 353 (Fla. 1982). Moreover, the association must also show that the challenged rule is ". . . within the association's general scope of interest and activity, and the relief requested must be of the type appropriate for a trade association to receive on behalf of its members." *Id.*

2. To show that members are "substantially affected" by the proposed rule, the Petitioners must show that the proposed rule will cause those members injury of sufficient immediacy and reality as to be accompanied by continuing, present adverse effects. *Florida Department of Offender Rehabilitation v. Jerry*, 353 So.2d 1230, 1235-36 (Fla. 1st DCA 1978); *State, Department of Health and Rehabilitative Services v. Alice P.*, 367 So.2d 1045, 1051-52 (Fla. 1st DCA 1979). It is also necessary to prove that the injury that will be suffered by the members if the proposed rule is promulgated is one that is within a zone of interest protected by law, whether within the statutes giving rise to authority to promulgate the rule, or elsewhere. *Florida Medical Association, Inc. v. Department of Professional Regulation*, 426 So.2d 1112, 1117 (Fla. 1st DCA 1983).

3. There is ample record evidence as to the dangers of radon and gamma radiation to persons living upon and owning mineralized land and reclaimed phosphate land, and there is ample record evidence that

282

the proposed rule is intended to protect the health of such persons. Thus, there can be little question that the members of the Petitioners who live on mineralized land, own reclaimed phosphate land and live on such land, have the potential of suffering injury that is within the zone of interests protected by the proposed rule. But none of these persons are Petitioners. Standing exists only to the extent that *Petitioners* have such standing, either individually, or as a representative of others.

4. Petitioners argue that the *Florida Home Builders* applies only to unincorporated associations. An argument of this sort is plausible, but Petitioners have not shown on this record that they are in fact corporations, and, as corporations, how the substantial interest of the corporations (rather than members the corporation seeks to represent) are at stake with respect to the proposed rules. The failure of the Petitioners to put on proof as to corporate status and the specific injury suffered by the corporation, leads inexorably to the conclusion that Petitioners, as alleged corporations, seek to represent the environmental interests of what Petitioners have called their "members." Representational standing, in this context, is indistinguishable from the representational interests of the association in the *Florida Home Builders Association* case, supra, and thus the rule of that case should apply here.

5. Respondent argues that by failing to prove the number of its members, Manasota-88 has failed to satisfy the test of *Florida Home Builders*, that the proposed rule will affect a "substantial number of its members." This is too strict a reading of the case. The purpose of the standing rule is to identify substantial interests. An association logically would itself have a substantial interest, consistent with its charter, if a substantial number of people, which it represents, are substantially affected by proposed agency action. The addition of the requirement that the number of people affected be a substantial number *of the membership* of the association would show a greater associational interest of the Petitioner. Here, however, where environmental issues are at stake, it should be enough that 150 persons live on mineralized land and are represented by the Petitioner, without an inquiry into whether these 150 constitute a substantial number of the membership of the Petitioner, Manasota-88. For this reason, Manasota-88 has shown its representational standing to bring this petition.

6. Petitioner, Concerned Citizens of Citrus County, Inc., has failed to show standing. There was no testimony as to the number of persons represented by that association who are claimed to be substantially affected by the rule. Absent evidence of how many persons are involved, there is insufficient evidence of the requirement of the *Florida*

*Home Builders* case, supra, that a "substantial" number of members be affected.

7. Concerned Citizens does not acquire standing by the testimony that Ms. Raines and Manasota-88 were participants in the agency's public hearing on these proposed rules. The proof is insufficient to show that Concerned Citizens was represented at this stage, or that it represented its members. More important, however, such participation does not constitute a grant of standing by the agency to initiate a section 120.54(4), Florida Statutes, rule challenge. To participate in the initial phases of rulemaking requires only that one be an "affected" person. Section 120.54(3), Florida Statutes. Rule 28-3.31(2), Florida Administrative Code. To participate in the instant administrative proceeding requires status as a "substantially affected" person. Section 120.54(4), Florida Statutes.

8. Petitioners cite section 403.412(5), Florida Statutes, as a basis for standing. That section begins with the promise of standing with regard to "any administrative, licensing, or other proceeding" concerning the environment of this state, and would seem to confer standing in a rule challenge as well as a section 120.57, Florida Statutes, hearing. But the end of the sentence limits such standing to such cases where the citizen can file a verified pleading.

. . . asserting that the activity, conduct, or product *to be licensed or permitted* . . . (E.S.)

will harm the natural resources of the state. The section thus only applies to licensing and permitting activity, and does not help Concerned Citizens.

9. The Petitioner in a challenge to a proposed agency rule has the burden of proving that (1) the agency adopting the rule has exceeded its authority, (2) the requirements of the rule are not appropriate to the ends specified in the legislative act, and (3) that the requirements contained in the rule are not reasonably related to the purpose of the enabling legislation, but are arbitrary or capricious. *Department of Professional Regulation v. Florida Society of Professional Land Surveyors, et al.,* Case No. AY-273 (Fla. 1st DCA, September 4, 1985), citing *Agrico Chemical Company v. State, Department of Environmental Regulation,* 365 So.2d 759 (Fla. 1st DCA 1979).

10. The first question is whether the challenged rule is either beyond statutory authority or in conflict with statutory authority. An agency is allowed a certain degree of latitude in its interpretation of a statute when it promulgates a rule thereunder:

When an agency committed with authority to implement a statute

construes the statute in a permissible way, that interpretation must be sustained even though another interpretation may be possible or even, in the view of some, preferable.

*Humosco, Inc. d/b/a Humana Hospital Manadarin v. Department of Health and Rehabilitative Services,* 10 Fla. L.W. 2246, 2247 (Fla. 1st DCA 1985). See also *Department of Professional Regulation, Board of Medical Examiners v. Durrani,* 455 SO.2d 515, 517 (Fla. 1st DCA 1984):

> . . . the agency's interpretation of a statute need not be the sole possible interpretation or even the most desirable one; it need only be with the range of *possible* interpretations. (E.S. by the Court.)

11. The second part of the test for the validity of a proposed rule is whether the rule or the requirements of the rule are arbitrary and capricious. *Agrico,* supra, 365 So.2d at 763. *Agrico* provides the following definitions for the words "arbitrary and capricious:"

> A capricious action is one which is taken without thought or reason or irrationally. An arbitrary decision is one not supported by facts or logic, or despotic. Administrative discretion must be reasoned and based upon competent substantial evidence. Competent substantial evidence has been described as such evidence as a reasonable person would accept as adequate to support a conclusion.

365 So.2d at 763.

12. The Respondent asserts that the Petitioner, Manasota-88, has not properly alleged or proven a challenge to the proposed rules, using the above standards, pursuant to section 120.54(4), Florida Statutes, but has instead filed and litigated a petition to initiate rulemaking, pursuant to section 120.54(5), Florida Statutes. The Respondent concludes, therefore, that the Division of Administrative Hearings does not have jurisdiction of petition to initiate rule-making. The Hearing Officer agrees. But whether the final result is a lack of jurisdiction, or a simple failure of proof pursuant to the standards set forth above, it is clear that the proposed rules have not been shown to be invalid in this proceeding, using the normal tests for the invalidity of a proposed rule.

13. Sections 404.051(4) and 404.056, Fla. Stat., are adequate authority for the proposed rules. The Department, in particular, has authority pursuant to section 404.056 to preserve and protect public health by the application and enforcement of "any environmental standards for land" which emits radiation. The record shows that the Department has considered those facts mandated by this statute: existing federal standards, recommendations of national expert groups, the use to be made of the land, and the availability of measures to mitigate.

14. The proposed rule does not conflict in any way with the above statutes. These statutes are silent on the issues raised by Manasota-88: the degree of public or private notification, the degree of monitoring and remediation, the radiation standard chosen, and the consideration of economics by HRS. (As to the latter, Section 404.056(1) requires consideration of federal standards, and federal standards as found above, consider the cost of regulation.) The statutes are silent as to the requirement of a remediation band. It is not a conflict with the enabling statute to fail to adopt a regulation that is weaker than might have been adopted by the agency.

15. With respect to all of the issues set forth in paragraph 14 above, Petitioner has failed to prove that the proposed rules are without support in fact or logic, or without thought or reason. The record, as set forth above in the findings of fact, shows that HRS adopted a balanced compromise system of regulation. Standards consistent with EPA recommendations have been proposed, reasonable structural standards for new construction have been adopted, a reasonable testing and monitoring program is proposed for those construction techniques in greatest need of testing, and a public information program is proposed for existing structures. While HRS could have regulated more strictly, to have failed to have done so is not arbitrary or capricious.

16. Assuming that a Hearing Officer may look at the state constitution as well as statutes to determine the invalidity of a proposed rule (a proposition which seems logical), it is clear on this record that Petitioner has failed to prove that the proposed rule contravenes Article II, Section 7, of the Florida Constitution (1968). That provision only mandates that "*adequate* provision shall be made by law for the abatement of air . . . pollution. . . ." Webster's New World Dictionary defines "adequate" to include the following:

1. equal to a requirement or occasion; sufficient; suitable. 2. barely satisfactory; acceptable but not remarkable.

The Hearing Officer rejects the definition proposed by the Petitioner that adequate must mean "*fully* sufficient." In common usage, adequacy is used to mean "acceptable but not remarkable." The proposed rules surely are at least "acceptable but not remarkable."

17. Petitioner has failed to provide proposed conclusions of law concerning whether the economic impact statement accompanying the proposed rules is adequate, and this issue has thus been abandoned by the Petitioner.

18. Polk County has a substantial interest in these proceedings with respect to the issue of whether the proposed rule unlawfully imposes

286

enforcement responsibilities upon that county. However, as set forth in the findings of fact, and now made a conclusion of law, the proposed rule does not *mandate* participation of counties in the enforcement scheme envisioned by the rule. Thus, the proposed rules are not invalid for the reason argued by Polk County.

## APPENDIX

### RULINGS UPON ALL PROPOSED FINDINGS OF FACT

A. The following, using the same numbers as used by the Petitioners in their proposed findings of fact, pages 5-27, are the specific rulings of the Hearing Officer as to each proposed finding of fact. If "adopted" the finding as proposed becomes a finding of fact in this recommended order. If adopted or rejected with qualifying statements, the qualifying statements, to the extent that facts are involved, are additional findings of fact.

1. Adopted.

2. Petitioners fail to give any page reference for the conclusions of fact proposed. The Hearing Officer cannot find any reference to the national average, and therefore rejects the second and third sentences of this proposed finding of fact. The fourth sentence is also incorrect. The report cited, HRS exhibit 3B, states in several places that the mean WL for undisturbed nonmineralized land to be 0.004 WL. The rest of the proposed finding of fact is adopted.

3. Rejected. Petitioners have failed to cite any portion of the record where this fact has been proven, and the Hearing Officer does not recall any such testimony. Further, the policy of the United States with respect to VA and FHA loans has not been shown to be relevant to this rule challenge.

4. Adopted. Additionally, the report noted that in some cases, application of a standard of 0.009 WL to a new structure might not be feasible or reasonable. Footnote 2 is rejected as legal argument.

5. Adopted.

6. The first sentence is adopted. Petitioners fail to cite the portion of the record supportive of the second sentence, and the Hearing Officer has no recollection of any such evidence in the record, and therefore, the proposed finding in the second sentence is rejected.

7. Adopted.

8. Table 12, page 57, of attachment A to Petitioner's exhibit 25A does not establish the proposed fact that use of crawl spaces and monolithic slabs at a cost of $550 will reduce radiation to 0.09 WL and

11 microroentgens/hour; section 5.0 implies this result, but does not state it with sufficient precision for a finding of fact to be made. Only the following statement of fact can be made: that the EPA estimated that it would cost $550 for ventilated crawl spaces, and for improved slab construction to reduce radon radiation by 80%, using 1977 dollars.

9. Adopted.

10. The first sentence is adopted. The second sentence is rejected since the record is closed for new exhibits.

11. Adopted.

12. Adopted.

13. There is no citation to the record for the last sentence of this proposed finding, and the Hearing Officer has no recollection of evidence on this point, and therefore the last sentence is rejected. The next to last sentence overstates the text of paragraph 4, page 38665, Petitioner's exhibit 5. The correct statement is as follows: Residents who *live a lifetime* in these homes [homes having radon levels from 0.03 to 0.1] *could* experience a risk of lung cancer which is 2-4 times the average risk to a member of the U. S. population. The rest of the proposed finding is adopted.

14. Adopted, including the footnote.

15. As discussed more completely in the findings of fact above, the EPA recommendations I through IV found on pages 38665-66, Petitioner's exhibit 5, do not recommend *mandatory* remedial action. Proposed finding of fact is adopted, except the word "mandatory."

16. There is no citation to the record to support proposed finding of fact 16, and the Hearing Officer is unable to find record support for this proposed finding, and therefore must reject it.

17. Adopted.

18. Petitioner's proposed finding of fact 18 is rejected for several reasons. First, the citation to Petitioner's exhibit 24 does not support the proposed finding, and the Hearing Officer has no recollection of any other record evidence to support this proposed finding. Second, the finding is not relevant. The task force did not adopt this apparently preliminary standard.

19. Petitioner's proposed finding of fact 19 is rejected in part because there is no citation to the record to support the finding that revisions were made due to "vigorous lobbying by the Florida Phosphate Council and the Florida Home Builders Association." The finding is

288

further rejected because the proposals of the subcommittee are irrelevant. The finding that the task force ultimately adopted a 0.027 WL standard has already been made.

20. Adopted, except the parenthetical "[to the public health]" is rejected. The EPA did not limit its consideration of costs to only the public health, but consistently evaluated the costs to home owners and land owners as well. See e.g. Petitioner's exhibit 5, p. 38669, numbered paragraph 3 and 5; Petitioner's exhibit 25A, attachment A, pages 56-75.

21. Adopted.

22. Rejected because prior drafts rules are not at issue in this case, and have no relevancy or weight as to what the proper standards should be.

23. Rejected for the same reasons as stated in 22 above.

24. Adopted.

25. Rejected because irrelevant. The issue in this case is not whether the Respondent has legal authority to adopt more stringent notice requirements, but whether a rule that fails to do so is an invalid exercise of delegated legislative authority.

26. Adopted.

27. Adopted with the following exception. Petitioner's exhibit 15 does not state that the Office of General Counsel stated any legal opinion as to notice. The exhibits fails to identify "OSLS," and the Hearing Officer cannot make a finding as to what that means. Moreover, the legal opinion stated in the exhibit by the OSLS, is not a fact, but is relevant only in argument as to conclusions of law.

28. Adopted.

29. While this proposed finding of fact contain a number of statements that are accurate, if adopted as phrased, the record would be incomplete. "Public health benefits" were not specifically analyzed as such for the construction options for new housing, but it would be incorrect to find that the Respondent did not consider such benefits, given all of the other record evidence that ventilated crawl space or slab construction are reasonably expected to reduce radiation levels to the "as low as reasonably achievable" standard. By limiting options to these constructions standards, with the alternative of variance from these construction standards coupled with testing and remediation, the Respondent de facto, has followed a path toward improving public health based upon the 0.02 WL standard. Moreover, with respect to

option 1, that the exhibit recommended adoption for three reasons, not just the one proposed by Petitioners. Finally, the last sentence of footnote 6 is rejected for lack of evidence. Petitioner's exhibit 4 does not explain how the thermoluminescent device is proposed to be used, and lacking evidence on the point, the Hearing Officer cannot conclude that the $30,000 cost is an estimate of the cost of preoccupation monitoring of 3,700 new houses. The $30,00 cost only reflects the purchase cost of 100 devices at $300 each. With these exceptions, the proposed finding is adopted.

30. Adopted, except that footnote 7 is rejected. There is no evidence of the expense to the Department of Agriculture to conduct its testing program, or the relevance to this proceeding.

31. Adopted.

32. Adopted, except the last sentence is rejected because Mr. Meyers did not expressly say that in his letter.

33. Adopted.

34. Adopted.

35. Adopted.

36. Adopted, except proposed finding 36d. The standard proposed is contained in proposed rule 10D-91.1104, and is "normal background radiation levels as reasonably achievable." The normal background is 0.004 WL and 6 microroentgens per hour. The maximum standard stated in the proposed rule is 0.02 WL and 20 microroentgens per hour.

37. Adopted, except that the second sentence is rejected because irrelevant. The legal authority of the Respondent to do something is a legal question, not a factual question.

38. Rejected. There is no evidence that Dr. Cox's opinions, elicited on cross examination, were intended to state the intentions of the Respondent with respect to testing devices and number and extent of use.

39. The first sentence is rejected. Mr. Guimond stated: "But you'd probably use a number of track etch cups, and you might do them in a various placement within the structure." By qualifying his opinion with "probably" and "might," Mr. Guimond made it clear that he was not expressing a rule. The remainder of the proposed finding is adopted.

40. Adopted, with the addition that Ms. Trott also testified that her duties include processing, development, and coordination of all parts of the rule package other than the rule itself.

41. Adopted, with the following exceptions. Ms. Trott did not testify that she obtained cost figures from a "lobbyist," or from any person of a particular profession other than the "Polk County Association of the Florida Homebuilders Association." The last two sentences are rejected because beyond the expertise of the witness as he himself testified, T.127, and beyond the expertise certified by the Hearing Officer. T.91.

42. Adopted.

43. Adopted.

44. Adopted.

45. Adopted.

46. Secretary Pingree made it clear that he deferred to the advice of legal counsel on the notification issue. Otherwise, the proposed finding is adopted.

47. Rejected. The relevance of this proposed finding is not shown by the record.

48. Adopted, except that Dr. Howell, is currently the Deputy Secretary.

49. Rejected. The record cited by Petitioners from these proposed findings of fact do not support the findings in the form proposed.

50. The first sentence of proposed finding 50 is rejected. Dr. Howell simply testified that it would be very hard to subject public health programs to a cost/benefit analysis. The second sentence is adopted.

51. Dr. Howell testified that exposure to 0.02 WL for 70 years would cause a risk of 2 additional lung cancer fatalities per 100 persons, and that that was a high risk. The proposed finding as worded is rejected.

52. Adopted.

53. Rejected. Dr. Howell vaguely testified that "if you had a good building technique, a good informed consent, you actually may allay a lot of fear." Petitioner's exhibit 25B, p.40. He did not tie this opinion to the proposed rule.

54. Adopted.

55. Adopted.

56. The first sentence is rejected because Dr. King did not make it clear what kind of "standard" he was referring to. All that Dr. King said was "there was no evidence in that literature to support a level other than what could be in fact detected in food, which was again, detection limit was then one per billion." Petitioner's exhibit 25F, p.

13. It is not at all clear that Dr. King was describing a ceiling, and since he was talking about detection thresholds, he was probably only talking about the practical limits of designing a standard. The second sentence is rejected because it is a distortion of what Dr. King said. Dr. King testified: "predominately the issue was the level of risk, *but the integral part of balancing was whether or not it was practical to eliminate from the food supply,* whether it was possible to technologically, as we understood it, to eliminate from the food supply ethylene dibromide." Id. The last sentence is adopted, but with the addition that such 1,000 persons have been exposed to average levels of EDB for a lifetime.

57. Adopted, except that the goal is one "adverse health effect" per one million, not "one lifetime fatality."

58. Rejected. The citation to the record does not support the proposed finding in the form proposed.

59. Adopted.

60. Adopted.

61. Adopted, with the following exceptions. The record cited does not support a finding that Dr. King recommended 0.02 WL because ⅓ of exiting homes would violate 0.02 WL, and does not support the proposed fact that ⅓ of existing homes would violate 0.01 WL. The record further does not support the finding that Dr. King made his recommendation based upon precedential value for other states. What Dr. King said was that he relied upon the precedent of the use of 0.02 WL by the Environmental Protection Agency. Petitioners exhibit 25F, p.25.

62. The first sentence is adopted. The second sentence is rejected. Petitioner's exhibit 25F, p. 23, 1. 21-25. The third sentence is rejected because it is irrelevant.

63. The proposed finding is a misstatement of the testimony. Dr. King said he looked at the EPA study, but could not remember what it said. Petitioner's exhibit 25F, p. 29, 1. 12-13.

64. Rejected as irrelevant. Dr. King's inability to remember this fact at this deposition is not relevant. Dr. King explicitly stated that he "heard a number of numbers," but that he could not recall any. Petitioner's exhibit 25F, p. 31, 32.

65. Rejected as misleading. Dr. King testified that in choosing the Working Level standard, he was more concerned about normal distribution, reliability of monitoring, and the ability to enforce effectively at the chosen standard. Petitioner's exhibit 25F, p. 33, 1. 7-18.

292

66. Adopted.

67. Rejected. Dr. King did not say that. He only said that the concern about remediation in existing homes was one that "we all felt needed to be addressed." Petitioner's exhibit 25F, p. 44 1. 10-11. He then said "I felt that at sometime soon we would have to deal with that issue." Dealing with an issue, or "addressing" an issue can mean that it was discussed, encouraged, rejected, mandated, or ultimately ignored after discussion. It does not mean adoption of a mandatory program of remediation.

68. Adopted.

69. Adopted.

70. Rejected. This is a misstatement of the testimony. Dr. King did not testify that he believed lands should be quarantined. Dr. King testified that "maybe" a Mr. Herron with the IMC, said that, and "Again, that would have been an ideal situation to be able to make that recommendation, I don't believe that that was within the preview of the charge that we had, however, to make that recommendation." Petitioner's exhibit 25F, p. 51, 1. 17-20.

71. Adopted.

72. Adopted.

73. Rejected. The testimony of equivocal and contains too many qualifications for this categorical proposed fact to be adopted. Petitioner's exhibit 25F, pp. 66, 1. 20-25, to 67, 1. 1-14.

74. Adopted.

75. Adopted.

76. Rejected. The testimony is unclear, and does not support the statement as proposed by Petitioners. Petitioner's exhibit 25H, p. 17, 1. 6-12.

77. Rejected. The portion of the record cited for this statement of fact contains comments of counsel, but does not contain clear testimony of the witness to prove this point.

78. Adopted.

79. Rejected. The witness did not say anything about "notification of buyers and lessees." He stated: "I think it would be a good idea to let people know in existing structures, which most of them already do." A buyer is not a person in an existing structure, and the issue of notice to buyers or prospective lessees is quite different from general notice to persons residing in structures. Petitioner's exhibit 25H, p. 32, 1. 2-3.

80. Adopted.

81. The first sentence is adopted. The second sentence is misleading. The persons named were clearly not intended by the witness to be the only persons. Petitioner's exhibit 25G, p. 6, 1. 18-21. The second sentence is rejected because it is false as proposed.

82. Rejected. Gordon Nifon did not testify that one of the "principle" considerations of "this group" was the economic impact of the standard on real estate values. He said that he felt that the 0.02 WL standard offered a significant degree of protection to people not now protected and yet it does not bring undue economic hardship to a lot of people. Petitioner's exhibit 25G, p. 5, 1-9. He was then examined closely about his opinion regarding economic impact, and finally stated that just about everyone who had impact upon the rule standard discussed how to balance economic impact *with* the public health. Id., p. 6, 1. 13-21. A finding can be made that economic impact was a consideration, but the record fails to support Plaintiff's suggestion that it was one of the principle considerations.

83. As proposed, the finding is rejected. A finding is made that there was some concern that at the 0.02 WL that too many houses would be affected, but the influence of that concern upon the final outcome of the proposed rule is not clear in the record. Petitioner's exhibit 25G, p. 12, 1. 1-3.

84. The first sentence is rejected. The witness was not certain. The second, third and fourth sentences are adopted.

85. Adopted.

86. The first sentence is adopted. The second sentence is rejected as proposed. The witness said that to do a "definitive study of any one home, there *might* be some reason to use more than one detector." He testified further: "I will only say that it wouldn't hurt, I suppose, to have two or more detectors. *But I'm not sure if it would be a great value.*" Petitioner's exhibit 25G, p. 15, 1. 14-16 and 20-22. This is not sufficient to adopt the proposed finding.

87. The first sentence is rejected. The witness made no representations as to what HRS had done with respect to testing. Petitioner's exhibit 25G, p. 12, 1. 6. The second sentence is adopted.

88. Adopted.

89. Adopted.

90. Adopted, with the addition that "lifetime risk" means exposure at a given number of Working Levels for a lifetime.

91. Rejected as phrased. The following statement is adopted as an alternative: Due to lack of complete data, some data collection was recommended by Mr. Guimond with respect to new construction on phosphate lands. Petitioner's exhibit 25A, pp. 13, 1. 25 to 19, 1. 17.

92. Rejected. The answer is unintelligible, the testimony is that of counsel rather than the witness, no predicate was laid for the witness' degree of familiarity with the study, the levels mentioned in the question are not identified or explained, the witness was not qualified as an expert, the study is hearsay, and the cited passage is otherwise not the sort of evidence that is sufficiently reliable for the purpose proposed by Petitioners.

93. Rejected as irrelevant.

94. Rejected. The N.C.R.P. standards are for both types of structures. Petitioner's exhibit 25A, p. 27, 1. 22-25.

95. Rejected in the form proposed. The following is adopted: (another space) Mr. Guimond that that the I.R.C.P. document was "pretty confusing", and had "quite a bit of caveats in there which would enable Governments to move the values they use either direction. . . ." Petitioner's exhibit 25A, p. 28. The testimony is insufficient to conclude that the I.R.C.P. document is "useless."

96. Adopted.

97. Rejected as phrased. The following is adopted. Mr. Guimond implied that the EPA often tries to get a higher degree protection than it did in these standards, but they felt it was a reasonable compromise based on trying to weigh risk and the absolute need of people for housing. Petitioner's exhibit 25A, p. 30.

98. Adopted. Mr. Guimond was further of the opinion that it would be a "legitimate approach" for HRS to make the suggestion to the Legislature that its authority to give such notice be given consideration. Petitioner's exhibit 25A, p. 34.

99. Adopted.

100. Adopted.

101. Adopted.

102. Rejected as stated. Dr. Jerrett testified that notification was desirable, not that it was "necessary." T.58, 1. 2-7.

103. The following statements of fact are erroneously included in the Petitioners' "Argument" section, and are ruled upon as if they were proposed findings of fact:

A. Paragraph 103B is adopted only to the extent stated in findings of fact 2 through 9.

B. Paragraph 103C is adopted.

C. Paragraph 103D, is adopted except there was no evidence of the participation of Concerned Citizens of Citrus County in the rule-making public hearings as parties.

B. The following, using the same numbers as used by the Respondent in its proposed findings of fact, pages 104, are the specific rulings of the Hearing Officer as to each proposed finding of fact. If "adopted," the finding as proposed becomes a finding of fact in this recommended order. If adopted or rejected with qualifying statements, the qualifying statements, to the extent facts ae involved, are additional findings of fact:

1. Adopted.

2. Adopted.

3. Adopted, except the last sentence, which is not fact.

4. Adopted. Petitioner's exhibit 25H, p. 6, 31.

5. Rejected as proposed. HRS is considering amendment to the proposed rule to include schools and public buildings. T.59, 77-78, 80; Petitioner's exhibit 25E, p. 8.

6. Adopted, except the fifth sentence is rejected. The Hearing Officer cannot conclude from the testimony of Stephen King, M.D., that an upper limit *less than* 0.02 WL would be unmanageable, unrealistic, or unenforceable. Dr. King was specifically referring to the setting of a *ceiling* standard *at background*, and simply indicated that it be both unrealistic and unmanageable to require ideal background when the background number is in fact only a point of distribution on a bell curve that is expected to have some values higher than the standard. Petitioner's exhibit 25F, pp. 35-36.

7. The first sentence is adopted. The second sentence is rejected as proposed. The rule speaks for itself, stating that counties which have lands "within their borders identified in 10D-91.1106(1) shall conduct . . . educational programs to advise the public that dwellings located on such lands have the potential of exceeding the standard. . . ." Proposed rule 10D-91.1108. The testimony is insufficient to conclude that in fact the educational program *will* include letters, brochures, or that HRS will have a full-time health educator. That was only the vision of the witness, and the full-time health educator was only a "budget issue," which means something HRS intends to ask the Legislature to find. T.63.

8. Adopted.

9. Adopted.

10. Rejected because it is a conclusion of law.

C. The Intervenor, Polk County, proposed only two findings of fact, designated paragraphs 7 and 8. Proposed finding of fact 7 is rejected, as more fully explained in the findings of fact, because the proposed rule does not impose any "duty" on the local building inspector since it uses the word "should." Proposed finding of fact 8 has been adopted in the findings of fact, although worded differently. HRS does expect that local building inspectors will follow their recommendations and the suggestion of the proposed rule and withhold the certificate of occupancy.

## CONCLUSION

Upon consideration of the foregoing, it is ORDERED that

1. Petitioner, Concerned Citizens of Citrus County, Inc., have failed to prove standing, and there are DISMISSED as a Petitioner in this case.

2. The remaining Petitioner and Intervenor have failed to prove that proposed rules 10D-91.1101 through 10D-91.1109 are an invalid exercised of delegated legislative authority.

DONE and ORDERED this 20th day of December, 1985, in Tallahassee, Florida.